**BROTHERHOOD OF RAILROAD TRAINMEN, Appellant,**

v.

**TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellee.**

**No. 20135.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 14, 1966.

Decided May 12, 1967.

Petition for Rehearing Denied June 7, 1967.

Certiorari Denied Nov. 6, 1967.

See 88 S.Ct. 290.

---

Mr. John H. Haley, Jr., East St. Louis, Ill., with whom Mr. Milton Kramer, Washington, D. C., was on the brief, for appellant.

Mr. Francis M. Shea, Washington, D. C., with whom Mr. Richard T. Conway, and Mr. Ralph J. Moore, Jr., Washington, D. C., and Mr. James R. Wolfe and Mr. Charles I. Hopkins, Jr., Chicago, Ill., were on the brief, for appellee. Mr. David Booth Beers, Washington, D. C., also entered an appearance for appellee.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and COFFIN,* Circuit Judge for the United States Court of Appeals for the First Circuit.

COFFIN, Circuit Judge:

This appeal centers about the propriety of the district court's view that a complex question of job protection of certain railroad employees was answered by the prior interpretations of Arbitration Board No. 282, compelling the court to deny a motion of appellant, the Brotherhood of Railroad Trainmen (BRT), for supplemental relief. While we agree with the action taken in denying the motion, we do so for a different reason. We do not construe the prior interpretations of the Board as determinative of the issue raised; rather, we think this case presents a question of interpretation of the award within the primary jurisdiction of the Board.

This is another chapter in the elaborate history of the controversy between railroads and railroad employee unions over eliminating certain provisions in collective bargaining agreements calling for firemen in engine crews and a stipulated number of employees in train and yard crews. In 1963, after the procedures of the Railway Labor Act had been exhausted, a threatened nation-wide strike was averted by the passage of P.L. 88—

---

* Sitting by designation pursuant to Section 291(a) Title 28 U.S.Code.

108, 77 Stat. 132, 45 U.S.C. § 157, which created Board No. 282 to provide for "final disposition" of both the "firemen issue" and the "crew consist issue" by compulsory arbitration.

The Board issued its award on November 25, 1963, effective January 25, 1964. By its own terms and by the terms of the underlying law, the award was to continue in force for two years thereafter.

Shortly after the issuance of the award, the appellee, Terminal Railroad Association of St. Louis (Terminal), served on BRT a notice proposing a reduction in the minimum number of persons required for a crew by the existing collective bargaining agreement. The notice referred to 106 crews out of an average number ranging from 170 to 190. Under the provisions of the basic award, a Special Board of Adjustment was appointed to apply relevant guidelines to the factual circumstances relating to the operation of the crews in question. The Special Board denied Terminal's proposals to reduce two specific crews, and to reduce all extra and subsequently established crews, but granted its proposals to reduce by one person all other listed crews. It refrained from giving procedural ad-

vice as to future questions of compliance but made clear that Terminal in carrying out its proposed reduction of crews must comply with the provisions of the basic award (III-D) relating to employee protection.

The entire section on employee protection is printed in the margin.[1] Terminal argues that, when it discontinues positions that the Special Board of Adjustment authorized it to discontinue and transfers protected employees to the "extra board" for allocation to extra crews to meet traffic needs and fill vacancies in regular crews, this service on extra crews constitutes the required "other employment" which satisfies the employee protection clause of the award. Terminal asserts that the extra crews are being operated as they have been in the past and that personnel on these crews have reasonably stable employment, as the existence of substantial charges for overtime work of the extra crews indicates. BRT, on the other hand, argues that only three "nonprotected" employees serve on the extra crews, that the extra crews have been doubled in size, and that substantial numbers of protected employees who formerly worked on a full five-day week have found them-

---

1. "Part D—Employee Protection

"D(1). Road trainmen and yard brakemen or helpers, other than those on furlough on the date that this Award becomes effective, shall be known and designated, for the purposes of this Award, as 'protected employees'.

"D(2). A 'protected employee', known and designated as provided in paragraph D(1) of this Award, shall retain his rights to and obligations to protect road and yard service assignments (including all assignments in miscellaneous and unclassified road services and all assignments in transfer, belt line, and miscellaneous yard services) for which he is qualified, as provided by rules in effect on the day preceding the day this Award becomes effective, to the extent that such positions are available to him in his seniority district, unless and until retired, discharged for cause, or otherwise removed from the carrier's active working lists of road trainmen

and yard brakemen or helpers by natural attrition; provided, that no such 'protected employee' shall have any right to jobs or positions that the carrier may discontinue pursuant to the provisions of this Award if other employment in any such classes of service, for which such employee is qualified, is available to him in his seniority district. If and when the carrier is required to create new jobs or positions for road trainmen or yard brakemen or helpers, pursuant to the provisions of this Award, such positions shall first be filled, to the extent available, by 'protected employees' then filling positions which the carriers would otherwise have the right to abolish or eliminate pursuant to the provisions of this Award, before such jobs or positions may be claimed by other employees of the carrier in accordance with their seniority rights."

selves working less than a full week.[2] BRT urges that the proper construction of the employee protection guarantee is that, on any day when a protected employee is not needed on an extra crew, he should be assigned to a position in a regular crew (which existed under rules established prior to the award) even though Terminal has been allowed to discontinue and has in fact discontinued that position.

The district court, in denying BRT's "motion for supplemental relief",[3] gave as its reason the following:

"While Board 282 has not expressly passed upon the question as to whether the men on the extra list are entitled to such assignments which carrier denies, and although the question is not as clear as counsel seem to argue, the Court is of the opinion that there is a necessary inference of implication from the various answers and interpretations that Board 282 has already made, that these men are not entitled to be assigned to vacancies that may arise from day to day by reasons of absence for any reason of the men who are composing the actual crews that are being operated in yard service."

The court denied the motion, but without prejudice to its renewal if the question of the rights of "protected" employees were submitted to Board No. 282 and a different conclusion were reached by that Board.

Our difference with the district court is that the record does not, in our opinion, allow us to say that prior Board responses have raised a "necessary inference" dispositive of this case. Moreover, as the areas of our doubt indicate, it is much more desirable that the Board, which has so painstakingly erected this edifice of rules and practice, be given the opportunity of applying the finish than that a court be invited to wield its awkward trowel.

▆ The source of the "necessary inference" lies in several questions of in-

2. Appellant in its brief presents a concise explanation of the twofold effect of (a) having a larger "extra board" available to (b) fill a smaller number of vacancies. This is its description of the impact of the Special Board Award on Terminal's Eleventh Street District:

"In that District there were 13 regular jobs, for which there were regular relief crews sufficient to do the work of those jobs on the regular crews' two days off per week. Under the collective bargaining agreement, each of two of those jobs required a foreman and a minimum of 3 helpers and the other 11 crews each required a foreman and a minimum of 2 helpers. It therefore required 13 foremen and a minimum of 28 helpers to man the regular crews, not counting the relief crews. Assuming that there were 50 employees in the district, 41 of them, those with the most seniority, would be regularly assigned to those 41 positions. The remaining 9 employees would therefore be 'extra men' and constitute the 'extra board'. These men were paid only if they worked in a temporary vacancy due to the temporary absence of 1 or more of the 41 employees theretofore assigned to the 13 regular crews or to one or more of the employees assigned to a regular relief crew or to man an 'extra' crew. Assignments of 'extra men' to temporary vacancies and to 'extra' crews was and is on the basis of seniority among the 'extra men'. A reduction of one helper in each of 13 crews necessarily results in each of 13 employees becoming an 'extra man' with more seniority than any of the 9 'extra men' theretofore on the 'extra board'. The 'extra man' who previously was number 1 on the 'extra board' thus becomes number 14 and the 'extra man' who formerly was number 9 on the 'extra board' thus becomes number 22 and the possibility for work in temporary vacancies in the reduced crews is reduced from the number of vacancies which may occur among 41 men to those which may occur among 28 men."

3. BRT's motion sought an order that Terminal "cease violating" the award of Board 282 and that it pay compensatory and punitive damages to its employees who were not permitted to work on discontinued jobs on days when other employment was not available. In the alternative, the motion sought rescission of the order enjoining BRT and its members from striking over disputes as to the meaning or application of the award.

terpretation put by both carriers and unions to the Board, covering both "crew consist" and fireman problems. Since the provisions of the award relating to firemen differ substantially from those relating to trainmen and yardmen,[4] we consider first the precedents directly relating to "crew consist" questions. Terminal urges that the Board's answers to three BRT questions, Nos. 24, 26(a), and 39, define the extent of the protected employees' rights in this case. BRT Question No. 24 asked if a carrier was permitted to reduce crews and force protected employees to extra boards even though such employees might not be paid on any day when such extra work is not provided. This question would seem to cover the issue in this case; but the Board's answer was Delphic. It said, *in toto*:

> "*Answer:* The carrier is permitted to make reductions in crew sizes pursuant to awards from special boards under Section III by placing 'protected employees' on the extra board to meet the needs of the board, provided that such reduction does not increase the size of the extra board above that established by rule, practice, or agreement. It is provided further that in the event of a subsequent decrease in the extra board because of a loss of business, men previously transferred to the extra board as a result of blanking of jobs shall be returned to regular assignments before any 'protected employee' on the extra board is laid off."

It should be noted, first, that, as BRT points out, this question and answer referred to a "regulated" extra board, where the size was so regulated as to guarantee reasonably full time employment by men on the board. That is, if men, taking work on a first-in-first-out basis, work less than a stipulated number of miles or days, some men are laid off so that those remaining can approach the stipulated amount of work. This kind of board differs from the seniority board in this case, with the result that the second sentence of the Board's answer is inapplicable.

But there remains a more substantial problem in applying the Board's answer to BRT Question 24 to this case. For it talks in terms of permitting reductions in crew sizes and placing "protected employees" on the extra board "to meet the needs of the board". It further spells out a proviso that "such reduction does not increase the size of the extra board above that established by rule, practice, or agreement". The record before us reveals on the one hand BRT's assertion that Terminal's extra board has been doubled and that substantial numbers of "protected employees" did not work on many days when extra board work ran out. On the other hand, Terminal asserts that the size of its extra board has never been subjected to any rule, practice, or agreement. Terminal also avers that it has tried to provide reasonably stable employment for its protected employees on the extra board. It points to the fact that it has not yet discontinued 14 of the 104 positions subject to elimination and that it has had to pay overtime for a significant number of shifts because it had fully utilized extra board personnel.

We take it, both from the Board's answer to BRT Question No. 24 and from its clarification of an answer relating to a firemen issue question—as we shall note, *infra*—that the essential prerequisite to effectuating reductions in positions is that a carrier shall not "play games" with the size of its extra

---

4. On our analysis, it is not necessary to decide whether the different treatment of the two classes is significant as far as the issue in this case is concerned. But we would note that Section II of the award seems to go further in abolishing firemen (helpers) positions and in terminating the employment of some categories of firemen (helpers) than does Section III, dealing with the "crew consist" issue. We note also a separate provision calling for the adjustment of "extra" lists for firemen, a provision absent in the section dealing with the yard and trainmen.

board. If a carrier could, without restraint, arbitrarily shift "protected employees" to an extra board and meet the "other employment" requirement of the award, there would indeed be no protection for the "protected". Terminal, of course, does not so argue. But we are not in a position where we can pass judgment on this vital issue. Nor do we think we should be so even though the evidence might be, as it is not, sufficient. This is the type of issue which is peculiarly within the specialized background of knowledge, experience, and understanding of the Board.[5]

■ The Board's answers to BRT's Questions Nos. 26(a) and 39 do not bridge the gap we have just discussed. The answer to 26(a) merely said that a "protected employee", assigned to an extra board, must be allowed to fill a position scheduled for elimination, but not yet eliminated, if his extra board work would not otherwise employ him on a given day. The converse problem was faced in answering No. 39 when the Board said that a different situation was posed by a carrier's discontinuing a position and then refusing to fill it with a "protected employee", the Board making the point indirectly that there could be no "vacancy" in a position which no longer existed. This lends partial support to Terminal, but not enough for us to resolve the question, since the proviso we have noted—the rules of the game with reference to the size of the extra board—was in no way alluded to.

■ We find the same Board philosophy expressed in its answers to questions relating to firemen—which, we have observed, may involve somewhat different and less protective considerations. Even here, however, the key Board response lay in its "clarification" of answers to questions from Southern Pacific Company, No. 1(e), and Brotherhood of Locomotive Firemen and Engineers, No. 2, both of which asked whether a carrier had to reopen a position it had discontinued to a protected fireman (helper) if failure to do so would cause him to lose work. As in its answer to BRT's Question No. 39 on the crew consist issue, the Board said that there could not be a "vacancy" in a position which had been discontinued. But, to guard against abuse of the right to assign protected classes of firemen to extra service, the Board stated that the carrier "shall be governed by the principle that men on the extra board shall have work opportunity reasonably comparable to that afforded men on the extra board prior to the Award". It said, further, that nothing in the award or in any interpretations "was intended to work an undue forfeiture upon * * * [the protected classes of] firemen-helpers on extra boards * * *. The question of what constitutes an undue forfeiture must be determined by the facts of the specific case."

Here again we say not only that we do not have enough facts to determine whether there has been an "undue forfeiture" but that the determination must be made in the first instance by the Board. The regulatory structure as we see it is delicately tuned. It is one which seeks to respond to the carrier's desire to eliminate unneeded positions while it also seeks to ease the impact of transition on employees. The balance is struck with a combined authority to eliminate regular positions and an obligation so to manage extra boards that in general "protected employees" on the extra board fare about as well as before. The "about as well" element may not be quite equivalent to prior regular work but must not drop too far below it. The judgment which should be brought to bear on this balancing act should be the sensitive judgment, enlightened by prior experience in comparable situations, of the Arbitration Board. That such is not only a dictate of common sense but also of the law we have had previous occasion to say. Brotherhood

---

5. All that we have said concerning the Board's answer to BRT Question No. 24 applies to another question (SUNA Question No. VIII) which raised the same issue.

**590**

of Railroad Trainmen v. Certain Carriers, 1965, 121 U.S.App.D.C. 230, 349 F.2d 207; Brotherhood of Railroad Trainmen v. Chicago, M., St. P. & P. R. R., 1965, 120 U.S.App.D.C. 295, 345 F.2d 985.

In oral argument BRT's only avowed reason for coming to court for simple enforcement of the award, rather than to the Board for interpretation, was that it did not think the award ambiguous. We have attempted to show wherein there was a gap to be filled with the help of the Board's experience. In addition, it was suggested that there was some doubt whether the Board continued to exist or had jurisdiction to interpret its own award after the expiration of the award in January 1966. We must take cognizance of this question, if the parties are not to be left in limbo.

■ We think that both in reason and in law Arbitration Board No. 282, despite the statutory limitation on the period to be governed by its award, must have the power to make its award effective during that period by interpretation. We find support for this view in P.L. 88–108 itself. Section 4 provides that "To the extent not inconsistent with this joint resolution the arbitration shall be conducted pursuant to sections 7 and 8 of the Railway Labor Act, the board's award shall be made and filed as provided in said sections and shall be subject to section 9 of said Act * * *." Referring to section 8 of the Railway Labor Act (45 U.S.C. § 158), we note that while paragraph (j) requires a specific limitation on "the period during which the award shall continue in force", paragraph (m) provides that "any difference arising as to the meaning, or the application of the provisions, of an award made by a board of arbitration shall be referred back for a ruling to the same board * * *." We see no reason why this sensible provision can be said to be "inconsistent" with the objectives of P.L. 88–108, and therefore we hold that Arbitration Board 282 retains similiar power to pass upon differences arising out of the contentions of these parties as to the meaning or application of Section III-D of the award.

Congress, seeking "a complete and final disposition", must have intended that the Board's interpretations must determine the boundaries of rights, privileges, and obligations of the parties with respect to the two-year period specified. It could not have intended that an hiatus exist as to this period, or, alternatively, a mixed application of Board and court rulings.

Affirmed.